# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

NICHOLAS TUINSTRA,

                Petitioner,

v.

MICHAEL MEISNER,[1]

                Respondent.

Case No. 22-CV-945-JPS

**ORDER**

## 1.    INTRODUCTION

In August 2022, Petitioner Nicholas Tuinstra ("Petitioner" or "Tuinstra"), through counsel, filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. ECF No. 1. His petition is grounded in allegations of ineffective assistance on the part of his trial counsel, Linda Meier ("Meier") and Barbara Privat ("Privat") (together, "defense counsel"), as well as a claim that the trial court's "routine" use of shackles violated his due process right to a fair trial. *See generally id.* The Court screened the petition, ECF No. 2, and it is now ripe for merits review. ECF Nos. 15, 21, 28. For the reasons discussed herein, the Court will deny the petition and dismiss this case.

---

[1]Petitioner is currently incarcerated at Fox Lake Correctional Institution. Wisconsin Offender Locator, https://appsdoc.wi.gov/lop/welcome (last visited July 24, 2025). The warden of that institution is currently Michael Meisner. The Court will accordingly order the Clerk of Court to replace Gary Boughton with Michael Meisner as Respondent in this matter. Rule 2(a) of Rules Governing Section 2254 Cases in the United States District Courts.

## 2.    BACKGROUND

### 2.1    The Events Giving Rise to the Criminal Case[2]

On the evening of September 27, 2014, Tuinstra's estranged wife, Melissa Tuinstra ("Melissa"), and her boyfriend, Justin Daniels ("Justin"), were fatally shot. It was later determined that Melissa and Justin were shot with a 9-millimeter gun, although that weapon was never recovered. *See* ECF No. 7-7 at 206–08; ECF No. 7-6 at 57. Melissa had moved out of her shared residence with Tuinstra just weeks earlier. ECF No. 7-8 at 87.

An investigator interviewed Tuinstra the next morning. Tuinstra reported that he had never been to Melissa's apartment except to drop off their daughter outside the building, and he said that the last time he had spoken with Melissa was at around 9:00 P.M. the night before, when he had called her after having a bad dream. He told the investigator that Melissa told him that he was "just having an anxiety attack" and that he should go to his mother's house. Tuinstra claimed that he could hear Justin in the background during this call. Tuinstra told the investigator that after the call, he drove to his parents' house, where his daughter was staying the night. He claimed to have arrived there at approximately 10:00 P.M.

Tuinstra was also asked whether he owned any guns. Tuinstra identified four guns that he claimed to have recently taken to his parents' house for safekeeping. Notably, none of the guns that Tuinstra identified

---

[2]The following factual background is not disputed, and Petitioner does not contend that the last state court to rule on the merits of his claims, *see State v. Tuinstra*, 959 N.W.2d 76 (Wis. Ct. App. 2021), made an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(2). The Court accordingly recounts these facts as set forth by the state court, and citations thereto are omitted for brevity.

was a 9-millimeter. Tuinstra said that he had traded guns in the past, and that the last time he had done so was "last year maybe."

Two days after this first interview, law enforcement served Tuinstra with a search warrant to collect his DNA and fingerprints. Tuinstra told law enforcement at that time that he "wanted to fill a few gaps" in his statement, so he participated in another interview with the same investigator and a captain (together, the "officers"). In this interview, Tuinstra stated that Melissa used to shoot guns with him and that in the days before her death, he gave her a 9-millimeter gun that he had acquired in a trade.

The officers told Tuinstra that they did not believe him, and they shared information that police had gathered since his first interview. They shared that cell phone records showed that Tuinstra called Melissa not once but twice, at 9:45 P.M. on the night of the homicides and again a few minutes later. The officers also told Tuinstra that they had a recording of shots being fired at 10:14 P.M., so they knew that Melissa and Justin died just fifteen minutes after Tuinstra spoke with Melissa.

Tuinstra then admitted that he had walked to Melissa's apartment that night to try to talk to her. He told the officers that Melissa was on the stairs leading to the apartment while Justin was at the door asking Melissa to come back inside. Tuinstra said that after Justin closed the door, Tuinstra heard a noise "like something was being cocked . . . like he was playing with their gun or door lock." When the officers asked what happened next, Tuinstra responded that he wanted to "say the rest with an attorney," and the interview ended.

The State charged Tuinstra with two counts of intentional homicide, one with a domestic abuse modifier. He was also later charged with stalking.

Case 2:22-cv-00945-JPS    Filed 07/24/25    Page 3 of 30    Document 29

### 2.2 The Trial

Tuinstra proceeded to a six-day jury trial. The State called Melissa's grandmother as one of its first witnesses. ECF No. 7-5 at 69. She testified that Melissa told her, about a month before the homicides, that Tuinstra had threatened to kill himself if Melissa left him. *Id.* at 73. The State, preemptively and outside of the presence of the jury, contended that this statement was not inadmissible hearsay because it was offered not for the truth of the matter but rather to show that Melissa "was in reasonable fear of harm . . . related to the stalking." *Id.* at 55 ("It's offered to prove the effect on Melissa[,] that she's in fear."). Defense counsel then responded that they would not object to the admission of that statement. *Id.* at 58. The court, beginning by acknowledging the lack of objection, concluded that it was not hearsay because it was not offered for the truth of the matter asserted. *Id.* at 64.

The jury also saw excerpts from Melissa's journal in which she wrote that she and Tuinstra had gotten into a fight, he had grabbed her, and he had said, "I have you all to myself." *Id.* at 55, 62, 74, 76. Again, preemptively and outside the presence of the jury, the defense objected to the State's plan to admit this evidence on the ground that it was hearsay and that the declarant, Melissa, could not be confronted. *Id.* at 58–59. The State contended that these statements were not hearsay because, like the statements allegedly conveyed to Melissa's grandmother, they were offered to show Melissa's state of mind. *Id.* at 56; *id.* at 61 (clarifying that the State sought to offer the journal statements pursuant to the "then existing mental, emotional, . . . existing state of mind" exception). The court ruled that the statement was admissible under the then-existing state of mind exception. *Id.* at 64.

The jury learned that Tuinstra and Melissa signed their divorce papers just three days before the homicides. *Id.* at 231–32. Multiple friends of Melissa's testified that they saw her with visible bruising, including around her neck, approximately two weeks before her death. *Id.* at 84, 87, 115, 193. They also testified that Tuinstra would call Melissa extremely frequently, sometimes as often as every five to ten minutes, *id.* at 86, 108–09, and that on one occasion they observed Tuinstra angrily withholding Melissa's phone from her, *id.* at 180. Witnesses testified that Melissa was "very fearful" of Tuinstra and did not feel safe at home. *Id.* at 87–88; *id.* at 191 (testifying that Melissa was "afraid [Tuinstra] was going to kill her"). One testified that she witnessed Tuinstra smack Melissa's hand on an occasion a few months before the homicides, *id.* at 105, 107, and another testified that Melissa told her about an incident in which Tuinstra had choked Melissa and broken her finger, *id.* at 190. Meanwhile, a neighbor testified that Tuinstra told him that he had pushed Melissa so hard in a fight earlier that day that she slid across the floor. *Id.* at 219.

Two witnesses testified to hearing Tuinstra yelling at Melissa and threatening to kill someone, just a few weeks before the homicides. *Id.* at 207–08, 214–16. A witness also described an occasion in which Tuinstra drove past the witness's house while Melissa was visiting, which Melissa described as him "stalking" her. *Id.* at 110. A restaurant employee testified that on the week of the homicides, Tuinstra sat in the restaurant on two or three occasions for several hours at a time in a spot from which he could view Melissa's apartment across the street. *Id.* at 223, 226–28. Multiple witnesses testified to having advised Melissa to report Tuinstra's behavior to police. *Id.* at 124, 193. One testified that Melissa feared that Tuinstra would hurt her or their daughter if she went to police. *Id.* at 124.

The jury learned that Tuinstra had purchased a nine-millimeter firearm in July 2014, *id.* at 127–28, 146–148, and that it came in a blue box, *id.* at 152. In a search after the homicides, this box was found in Tuinstra's gun safe. *Id.* at 160–61 (referencing Exhibit 4 as photo of the firearm box from Tuinstra's purchase); ECF No. 7-7 at 198 (confirming that Exhibit 4 depicted the box that was found in the gun safe). Law enforcement also found full boxes of nine-millimeter ammunition. ECF No. 7-7 at 219–21.

Several witnesses also testified specifically regarding the evening of the homicides. A bar employee testified that Tuinstra visited the bar earlier that evening and was "upset" about Melissa's infidelity and the divorce. ECF No. 7-5 at 235–38. A neighbor of Melissa's testified to being woken up by the sound of gunshots around 10:10 P.M. that night. *Id.* at 244. A voicemail on the phone of one of Justin's friends similarly demonstrated that shots were fired at around 10:14 P.M. ECF No. 7-6 at 108, 110. A neighbor of Tuinstra's parents testified that he saw via his surveillance camera that Tuinstra arrived at his parents' house that night at around 11:10 P.M. *Id.* at 116, 119. A detective testified that it would take, at most, 34 minutes to drive from Melissa's apartment to Tuinstra's parents' house. ECF No. 7-7 at 208–210, 213–15.

Tuinstra's mother testified that Tuinstra arrived at her home the night of the homicides around 11:15 P.M. and that he was upset and worried. ECF No. 7-7 at 110; *id.* at 122 (Tuinstra's and Melissa's daughter testifying to a similar arrival time); ECF No. 7-11 at 94 (Tuinstra's father testifying to a similar arrival time). Tuinstra told his parents that he had a bad dream in which something terrible had happened to Melissa at Justin's hands. ECF No. 7-7 at 111–12; *id.* at 123–24 (Tuinstra's and Melissa's daughter testifying to the same). Tuinstra's mother testified as to what

Tuinstra had been wearing that night and was then impeached by her former statement to law enforcement that she did not remember what her son had been wearing. *Id.* at 112–13. She confirmed that Tuinstra had brought his gun safe to his parents' home several weeks prior. *Id.* at 111.

Witnesses discovered Melissa's body on the street outside her apartment building at around 11 P.M, ECF No. 7-6 at 24, and law enforcement was dispatched to the scene at 11:02 P.M., *id.* at 30. Police discovered Justin's body in the doorway of Melissa's apartment shortly thereafter. *Id.* at 32. There was no sign of forced entry, nor any indication of robbery or burglary. *Id.* at 37. Justin's autopsy revealed seven gunshot wounds, at least one of which was fired from within a few feet. *Id.* at 82, 85–86, 90, 101. Melissa also had various gunshot wounds, none of which appeared to have been inflicted from close range. ECF No. 7-7 at 66, 69–81. All the bullets and casings discovered at the scene were determined to have been fired from the same gun. ECF No. 7-8 at 121, 144.

Forensic examination of Melissa's phone revealed several texts sent to Tuinstra that night. ECF No. 7-6 at 144, 149. At 9:49 P.M., Melissa texted Tuinstra, "Not tonight, in the morning." *Id.* at 149. Less than a minute later she sent, "Please and sorry." *Id.* It also revealed that the evening prior, Tuinstra asked Melissa by text how long she and Justin had dated in high school. *Id.* at 153. When Melissa responded that she didn't remember, Tuinstra responded, "I will pay him a visit soon and ask him." *Id.* at 154. A detective testified that sometime after the homicides, Tuinstra admitted to having previously threatened Justin. ECF No. 7-11 at 44–45 ("[I]n that phone call, he said stay away from my family or I will get you.").

The jury also heard that police extracted data from Tuinstra's phone, ECF No. 7-6 at 154–56, demonstrating that Tuinstra called Melissa several

times on the night of the homicides, including once after she was already deceased, *id.* at 158–60, as well as that content had been deleted from the phone, *id.* at 170, 172–73, 197.

An officer also testified that in a search of Tuinstra's residence and garage, law enforcement found a piece of paper with Justin's name, date of birth, phone number, and address written on it. ECF No. 7-7 at 87–88, 90–91. Law enforcement also found a tag for a pair of gloves in the kitchen garbage bin, and an officer testified that no gloves matching the tag were found. *Id.* at 93–94. They also found latex rubber gloves with "a brown tint" in the exterior garbage can. *Id.* at 101. Police also found a handwritten will along with other papers dated September 11, 2014. *Id.* at 95–97. In the will, Tuinstra purported to leave "<u>all</u> guardian rights" over his and Melissa's daughter to his parents, making no mention of Melissa. *Id.* at 98–99.

A police investigator testified to having interviewed Tuinstra the morning after the homicides. ECF No. 7-8 at 80. When she informed Tuinstra that his wife had been found deceased, his reaction was "very minimal," and he did not ask about how or where she had died. *Id.* at 84, 86. When asked to list the firearms he owned, he did not reference a nine-millimeter. *Id.* at 84. When asked whether he had ever been to Melissa's apartment building, he responded that "at most, he might have dropped" their daughter off outside. *Id.* at 85. He also told the investigator that he had a bad dream that evening "that something very violent was about to happen." *Id.* at 90 ("[H]e expanded on that dream, saying that . . . someone came to the apartment. There was bickering and a ruckus. It went bad. There was loudness . . . he thought it was the gun shots."). According to the investigator, Tuinstra first told her that he arrived at his parents' house at around 10:30 P.M. that night but then said 10:00 P.M. *Id.* at 91–92.

The day after that interview, a social worker interviewed Tuinstra. ECF No. 7-11 at 25. She testified that Tuinstra told her that he had taken sleeping pills on the evening of the homicides, that he had "been having blackouts" that past week, and that he believed that he had a black out on the night of the homicides. *Id.* at 28–29. ("He said that he had a dream that night . . . that something bad had happened, and . . . that he was not sure if it was a dream or a reality, but that it could have happened and he was involved.").

Tuinstra again spoke with investigators on September 30, 2014 to "fill in some gaps." *Id.* at 62–63. The same investigator that had interviewed him previously testified at trial that Tuinstra claimed to have given Melissa a nine-millimeter firearm sometime in the week or so before the homicides. *Id*. at 63–64. On this occasion, Tuinstra also informed investigators that he met up with Melissa outside of her apartment on the night of the homicides. *Id.* at 66.

The State also called a domestic violence expert. Outside of the presence of the jury, the court considered the defense's objection that the general statistics in a PowerPoint that was to be presented to the jury — including the statistic that women "are at a 75 percent greater risk of being killed" when they leave their partner — were irrelevant. ECF No. 7-8 at 6–17. The expert testified to the origin of the information and stated that it is frequently cited in the field and considered generally scientifically reliable. *Id.* at 11–12. The expert attributed additional pieces of information in the PowerPoint to Dr. Jackie Campbell, "a leading researcher in the area of domestic violence, lethality, and risk for homicide." *Id.* at 13. When asked by the court whether the statistics were "relatively recent," the expert responded that although they were approximately a decade old, they were

nevertheless "currently used" and since confirmed. *Id.* at 15. The court overruled the relevancy objection, noting that the expert's purpose was to "give general information" regarding domestic violence and lethality risk and concluding that the information in the PowerPoint "is relevant to give the jury a better understanding of domestic violence." *Id.* at 17.

The expert presented his PowerPoint with information about domestic violence to the jury, and he confirmed that "pushing someone so hard that they slide across the floor" would constitute physical abuse. *Id.* at 36. He also confirmed that monitoring a partner's texts and "repeat telephone calling" would qualify as stalking, *id.* at 40, and that "oftentimes abusers claim ownership of their partners," *id.* at 48. He testified that in abusive relationships, there "tends to be an escalation unless there's some kind of an intervention," *id.* at 51, that abusers commonly display the belief that if their partner were to leave them, their life would be over, *id.* at 53, and that they may "mak[e] suicide or homicide threats," *id.* at 55. He also noted that an abuser's ownership of a gun and having threatened suicide are correlated with higher lethality risk. *Id.* at 65–66 (deeming these "the highest risk factors").

On the third day of trial, outside of the presence of the jury, the court addressed the matter of a phone call that Tuinstra had made the day before. ECF No. 7-6 at 6. In the call, which was recorded and played into the record, Tuinstra said that he was "going to see if [he] could get someone else brought in here for a mistrial or something." *Id.* at 7. It was this that triggered Tuinstra's table being moved away from his attorneys and the placement of an additional deputy behind Tuinstra. *Id.* at 12–13. Tuinstra's trial counsel agreed on the record at that time that this set up was "the best

alternative," and Tuinstra affirmed to the court that he believed he would still be able to appropriately communicate with his attorneys. *Id.* at 20.

One of the witnesses that the defense called was Tuinstra's divorce attorney. ECF No. 7-11 at 85–86. She testified that she drafted a joint petition for divorce on Tuinstra's and Melissa's behalf. *Id.* at 87. Defense counsel did not ask her about Melissa's and Tuinstra's demeanor towards each other during that time. *See id.* 85-88.

On the sixth day of trial, the jury returned a verdict of guilty on all counts charged. *Id.* at 229.

### 2.3 The State Post-Conviction Proceedings

Petitioner went back before the trial court for various post-conviction relief proceedings throughout 2018. ECF No. 7-13; ECF No. 7-15; ECF No. 7-16. At one, post-conviction counsel noted that, in response to testimony at trial that witnesses saw Melissa with bruising on her neck, trial counsel did not introduce photos of Melissa taken around that same time, which were provided to counsel in discovery, in which no such bruises can be seen. ECF No. 7-13 at 62.

### 3. STANDARD OF REVIEW ON HABEAS

State criminal convictions are generally considered final. Review may be had in federal court only on limited grounds. To obtain habeas relief from a state conviction, 28 U.S.C. § 2254(d)(1) (as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA")) requires the petitioner to show that the state court's decision on the merits of his constitutional claim was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. *Brown v. Payton*, 544 U.S. 133, 141 (2005) (citing 28 U.S.C. § 2254(d)(1)). The burden of proof rests with the petitioner. *Cullen v.*

*Pinholster*, 563 U.S. 170, 181 (2011) (citing *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam)). The relevant decision for this Court to review is that of the last state court to rule on the merits of the petitioner's claim. *Charlton v. Davis*, 439 F.3d 369, 374 (7th Cir. 2006) (citing *McFowler v. Jaimet*, 349 F.3d 436, 446 (7th Cir. 2003)).

A state-court decision runs contrary to clearly established Supreme Court precedent "if it applies a rule that contradicts the governing law set forth in [Supreme Court] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme] Court but reaches a different result." *Brown*, 544 U.S. at 141 (citing *Williams v. Taylor*, 529 U.S. 362, 405 (2000) and *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam)). Similarly, a state court unreasonably applies clearly established Supreme Court precedent when it applies that precedent to the facts in an objectively unreasonable manner. *Id.* (citing *Williams*, 529 U.S. at 405 and *Woodford*, 537 U.S. at 24–25); *Bailey v. Lemke*, 735 F.3d 945, 949 (7th Cir. 2013).

The AEDPA undoubtedly mandates a deferential standard of review. The Supreme Court has "emphasized with . . . vigor" the strict limits imposed by Congress on the authority of federal habeas courts to overturn state criminal convictions. *Price v. Thurmer*, 637 F.3d 831, 839 (7th Cir. 2011) (citing *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011)). It is not enough for the petitioner to prove the state courts were wrong; he must also prove they acted unreasonably. *Harrington*, 562 U.S. at 101; *Campbell v. Smith*, 770 F.3d 540, 546 (7th Cir. 2014) ("An 'unreasonable application of' federal law means 'objectively unreasonable, not merely wrong; even "clear error" will not suffice.'" (quoting *White v. Woodall*, 572 U.S. 415, 419 (2014))).

Indeed, the petitioner must demonstrate that the state court decision is "so erroneous that 'there is no possibility fairminded jurists could

disagree that the state court's decision conflicts with [the Supreme] Court's precedents.'" *Nevada v. Jackson*, 569 U.S. 505, 508–09 (2013) (quoting *Harrington*, 562 U.S. at 102). The state court decisions must "be given the benefit of the doubt." *Woodford*, 537 U.S. at 24; *accord Hartjes v. Endicott*, 456 F.3d 786, 792 (7th Cir. 2006). Further, a state court is afforded even more latitude under the AEDPA in its application of general standards. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (determining that the *Strickland* standard is a general one); *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." (citing *Wright v. West*, 505 U.S. 277, 308–09 (1992) (Kennedy, J., concurring))).

As the Supreme Court has explained, "[i]f this standard is difficult to meet, that is because it was meant to be." *Harrington*, 562 U.S. at 102. Indeed, § 2254(d) stops just short of "imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." *Id.* (citing *Felker v. Turpin*, 518 U.S. 651, 664 (1996)). This is because "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* at 102–03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring)).

A federal court may also grant habeas relief on the alternative ground that the state court's adjudication of a constitutional claim was based upon an unreasonable determination of the facts in light of the evidence presented in the state proceeding. 28 U.S.C. § 2254(d)(2). The underlying state court findings of fact and credibility determinations are,

Case 2:22-cv-00945-JPS    Filed 07/24/25    Page 13 of 30    Document 29

however, presumed to be correct. 28 U.S.C. 2254(e)(1). The petitioner overcomes that presumption only if he proves by clear and convincing evidence that those findings are wrong. *Id.* "A decision 'involves an unreasonable determination of the facts if it rests upon factfinding that ignores the clear and convincing weight of the evidence.'" *Bailey*, 735 F.3d at 949–50 (quoting *Goudy v. Basinger*, 604 F.3d 394, 399–400 (7th Cir. 2010)). "'[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" *Burt v. Titlow*, 571 U.S. 12, 18 (2013) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)).

If shown, an unreasonable factual determination by the state court means that this Court must review the claim in question de novo. *Carlson v. Jess*, 526 F.3d 1018, 1024 (7th Cir. 2008). A federal court also reviews a § 2254 claim de novo where the state courts failed to "reach the merits" of the federal constitutional claim entirely. *Cone v. Bell*, 556 U.S. 449, 472 (2009) ("Because the Tennessee courts did not reach the merits of Cone's . . . claim, federal habeas review is not subject to the deferential standard that applies under AEDPA to 'any claim that was adjudicated on the merits in State court proceedings.' 28 U.S.C. § 2254(d). Instead, the claim is reviewed *de novo*." (citing *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) and *Wiggins v. Smith*, 539 U.S. 510, 534 (2003))).

## 4. LAW AND ANALYSIS

### 4.1 Due Process

The Court begins with Petitioner's argument that the trial court violated his due process right to a fair trial when it ordered him to wear leg

shackles at trial without making any particularized findings for the need to do so. ECF No. 15 at 3.[3]

As a threshold matter, the parties disagree on the standard of review applicable to this claim. Petitioner contends that this Court's standard of review is de novo "since the Court of Appeals did not address whether the security measures violated Tuinstra's due process rights." *Id.* at 3. Respondent contends that the Court's review of this claim is subject to AEDPA deference because the Wisconsin Court of Appeals' rejection of Tuinstra's argument "that the trial court erroneously exercised its discretion in ordering the security measures" "necessarily rendered a decision on the 'intrinsic right and wrong' of Tuinstra's constitutional

---

[3]Tuinstra's petition framed this first claim as whether the trial court violated his right to a fair trial by its "routine use of shackles." ECF No. 1 at 8. The Court in its screening order accordingly recited it identically. ECF No. 2 at 2 ("violation of due process right to a fair trial as a result of the trial court's routine use of shackles[]"). In his brief in support, however, Tuinstra attempts to expand the fair-trial claim to attack not only the use of shackles, but also the mid-trial security increase (specifically, the fact that Tuinstra was moved "four feet away from his lawyers" and "had an extra deputy stationed directly behind him"). ECF No. 15 at 13–14.

This broadening of the claim from that which was originally stated in the petition was improper. While Tuinstra mentions counsel's "fail[ure] to object to security measures added mid-trial" in the context of his ineffective assistance of counsel claim, ECF No. 1 at 8–9, he did not reference the added security measures as relevant to, or an independent basis for, a violation of his right to a fair trial. The petition *itself* must set forth "all the grounds for relief which are available to the petitioner . . . and shall set forth in summary form the facts supporting each of the grounds . . . ." Rules Governing 28 U.S.C.S. § 2254 Proceedings. The Court accordingly limits its discussion of this ground for relief to the "routine use of shackles." ECF No. 1 at 8. While the Court is obligated to perform a more liberal review of a pro se Petitioner's filings, the Court has no such obligation with respect to a represented Petitioner, as in this case. *Blake v. United States,* 841 F.2d 203, 205 (7th Cir. 1988) (citing *Haines v. Kerner,* 404 U.S. 519 (1972) and *Sizemore v. Williford,* 829 F.2d 608, 609 (7th Cir. 1987)).

claim[].” ECF No. 21 at 9 (quoting *United States v. Bell*, 819 F.3d 310, 321–22 (7th Cir. 2016) and citing *Deck v. Missouri*, 544 U.S. 622, 629 (2005)); *id.* at 8 (“When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court *must* presume that the federal claim was adjudicated on the merits.” (quoting *Johnson v. Williams*, 568 U.S. 289, 301 (2013))).

As Respondent notes, the Court of Appeals framed the question of whether the trial court's decision to defer to the sheriff's office recommendation that Petitioner wear leg shackles at trial was an abuse of discretion. *Tuinstra*, 959 N.W.2d, ¶ 16. That is also how Petitioner framed the issue in his opening briefing to that court, as Petitioner now concedes. ECF No. 15 at 15.

The court did not explicitly analyze the issue as a constitutional one. It did, however, acknowledge Petitioner's argument that “the trial court's ‘shackling decision violated [his] right to a fair trial’” before ultimately concluding that the trial court appropriately exercised its discretion in imposing the shackles requirement. *Tuinstra*, 959 N.W.2d, ¶¶ 17, 20. This is not, therefore, a case in which the court made no acknowledgement whatsoever of the federal constitutional claim such that the reviewing habeas court could assume that consideration of it was omitted “as a result of sheer inadvertence.” *See Johnson*, 568 U.S. at 302–03.

The Court must agree with Respondent that although the Court of Appeals did not explicitly evaluate the claim as a federal constitutional one, it nevertheless “evaluated [it] based on the intrinsic right and wrong of the matter” rather than on “matters of form” such that the Court can deem it to have been reviewed on its merits. *Id.* Given the court's acknowledgement that Petitioner argued that the shackling violated his right to a fair trial, the

Court cannot conclude that "the evidence leads very clearly to the conclusion that [the] federal claim was inadvertently overlooked" such that Petitioner would be entitled to de novo review. *Id.* at 303. Given that acknowledgement, the Court must presume that the Court of Appeals adjudicated the federal claim on its merits. *Id.* at 301.

The application of that presumption is also supported by Petitioner's own briefing to the Court of Appeals. *Id.* at 306. In his brief, Petitioner primarily characterized the issue as whether the trial court "erroneously exercised its discretion by deferring to the sheriff's department" with respect to shackling, but he later within the same section made brief reference to his "right to a fair trial." ECF No. 7-1 at 22–23. Petitioner himself "treated [these] state and federal claims as interchangeable, and it is hardly surprising that the state courts did so as well." *Johnson*, 568 U.S. at 306; *see also Hinkle v. Neal,* 51 F.4th 234, 241 (7th Cir. 2022) ("It was Hinkle who instructed the state appellate court in his briefing to review his constitutional claim for abuse of discretion."). For all these reasons, the Court concludes that AEDPA's deferential standard of review applies.

Having so concluded, the Court next considers whether the Wisconsin Court of Appeals unreasonably applied or acted contrary to clearly established federal law in its disposition of this claim. The Court must conclude that it did not, because no Supreme Court authority dictates that non-visible shackles of which the jury is not made aware can be used only when supported by reasons specific to the defendant on trial.

Clearly established federal law "refers to the holdings . . . of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Garcia v. Hepp*, 65 F.4th 945, 949 (7th Cir. 2023) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). As earlier noted, "[a] state-court decision

is contrary to [Supreme] Court[] clearly established precedents if it applies a rule that contradicts the governing law set forth in [Supreme Court] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of th[e] [Supreme] Court but reaches a different result." *Brown*, 544 U.S. at 141 (citing *Williams*, 529 U.S. at 405 and *Early*, 537 U.S. at 8).

"[C]ertain practices pose such a threat to the 'fairness of the factfinding process' that they must be subjected to 'close judicial scrutiny.'" *Holbrook v. Flynn*, 475 U.S. 560, 568 (1986) (quoting *Estelle v. Williams*, 425 U.S. 501, 503–04 (1976)). For example, forcing a defendant "to wear prison clothes when appearing before the jury" is unconstitutional because it "may affect a juror's judgment" and is supported by no "essential state policy." *Id.* (quoting *Estelle*, 425 U.S. at 504–05).

The practice of shackling a defendant before the jury is also subject to scrutiny since "the sight of shackles . . . might have a significant effect on the jury's feelings about the defendant," *Illinois v. Allen*, 397 U.S. 337, 344 (1970), and since it is an "unmistakable indication[] of the need to separate a defendant from the community at large." *Holbrook,* 475 U.S. at 569. The Supreme Court has accordingly held that "the Constitution forbids the use of visible shackles" during both the guilt and penalty phases of a criminal trial, "*unless* that use is 'justified by an essential state interest'—such as the interest in courtroom security—specific to the defendant on trial." *Deck v. Missouri*, 544 U.S. 622, 624 (2005) (citing *Holbrook*, 475 U.S. at 568–69 and *Allen*, 397 U.S. at 343–44). When a defendant challenges his shackling, "the key issues are whether the jury 'was aware of' the shackles or whether the shackles 'were readily visible.'" *Roche v. Davis*, 291 F.3d 473, 483 (7th Cir. 2002) (quoting *Fountain v. United States*, 211 F.3d 429, 435 (7th Cir. 2000)); *see also United States v. Cooper,* 591 F.3d 582, 588 (7th Cir. 2010) (concluding

that district court's failure to make any particularized findings about the need to place the defendant in shackles was not plain error because they "were not *visible* shackles").[4]

At his trial, Petitioner wore leg shackles under a skirted table. At a later post-conviction hearing, "he testified that he noticed early in the trial that his ankle shackles rattled under the table if he tried to move." ECF No. 15 at 14 (citing ECF No. 7-16 at 180). He limited attempts at movement, however, because he was intimidated by the placement of a deputy behind him. *Id.* (citing ECF No. 7-16 at 193). Accordingly, and while Petitioner points out that shackles can become discernable to the jury by sound if not by sight, ECF No. 15 at 17 (citing *Stephenson v. Wilson*, 619 F.3d 664, 669 (7th Cir. 2020)), there is no indication that any juror in fact heard the shackles in this case.

The Wisconsin Court of Appeals concluded that the trial court appropriately exercised its discretion in mandating the use of the leg shackles notwithstanding a lack of particularized findings as to their need because "the trial court took steps to ensure that the leg shackles were not visible to the jury" and since "Tuinstra d[id] not assert that the jurors saw the leg shackles." 959 N.W.2d, ¶ 19. That conclusion did not run afoul of clearly established Supreme Court precedent. Petitioner asserts that this conclusion conflicted "with the *Deck* holding that [shackling]

---

[4]Circuit, rather than Supreme Court, precedent does not in and of itself constitute "clearly established" federal law for purposes of habeas review, but it nevertheless may help guide the inquiry. *See Lewis v. Zatecky*, 993 F.3d 994, 1000 (7th Cir. 2021) ("For purposes of section 2254(d), the only relevant law is that which is 'clearly established Federal law, as determined by the Supreme Court of the United States[.]' . . . . Our own decisions, as well as those of other circuits or state courts, are informative only insofar as they may shed light on our understanding of the authoritative Supreme Court precedents.").

determinations 'requir[e] a case-by-case determination,' ECF No. 15 at 16, but *Deck's* particularized findings requirement is explicitly limited to the case of "visible shackles," 544 U.S. at 624, since "[i]f the jury [is] unaware of the [restraint], they could not have drawn any impermissible inferences from it about [the defendant's] guilt or innocence." *Ziegler v. Benzel*, No. 13-cv-0609-bhl, 2020 WL 6287698, at *4 (E.D. Wis. Oct. 27, 2020) (concluding that there is no clearly established Supreme Court precedent precluding the use of invisible restraints or mandating requirements on the use of such restraints). Petitioner's leg shackles were indisputably not visible or otherwise discernable to the jury, so the Wisconsin Court of Appeals did not hold contrary to *Deck* when it concluded that the trial court "was not required to delve into the reasons for those restraints." 959 N.W.2d, ¶ 19; *see Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 842 (6th Cir. 2017) (noting that "[t]he Constitution mandates an individualized assessment in *every* case prior to the imposition of *visible* restraints upon a defendant" and that the "visibil[ity]" of the restraints "marks the key inquiry," and concluding that petitioner was not entitled to relief under AEDPA where there was "no evidence that the jury actually saw the [restraint], much less recognized it as [such]" (emphasis added) (quoting *Earhart v. Konteh*, 589 F.3d 337, 349 (6th Cir. 2009) and citing *Mendoza v. Berghuis*, 544 F.3d 650 (6th Cir. 2008))). Petitioner is accordingly not entitled to relief on this ground.

### 4.2    Ineffective Assistance of Counsel

Petitioner next contends that his trial counsel denied him effective assistance of counsel at trial. Petitioner raises the following specific complaints about counsel's performance: failure to object to mid-trial security changes violating Petitioner's right to counsel; failure to object to mid-trial security changes violating Petitioner's due process right to a fair

trial; failure to effectively challenge the State's domestic violence expert or present an independent expert in response; failure to introduce selfie photos taken by Melissa on September 7–8 showing a lack of bruises; failure to object to a hearsay statement regarding Tuinstra's alleged threat to commit suicide; failure to elicit testimony from the Tuinstras' divorce attorney regarding their demeanor toward each other prior to the homicides; failure to cite proper legal authority in hearsay objection to Melissa's journal statements; and failure to object to questions posed to Melissa's friend that were irrelevant and designed to elicit prejudicial information. ECF No. 1 at 8–17; ECF No. 2 at 2–3.

Courts apply the two-prong test, set forth in *Strickland,* to evaluate the effectiveness of counsel. *Makiel v. Butler*, 782 F.3d 882, 897 (7th Cir. 2015). "The Sixth Amendment guarantees a defendant the effective assistance of counsel at 'critical stages of a criminal proceeding,' including" at the plea stage. *Lee v. United States*, 582 U.S. 357, 363 (2017) (quoting *Lafler v. Cooper*, 566 U.S. 156, 165 (2012) and citing *Hill v. Lockhart*, 474 U.S. 52, 58 (1985)). "A party asserting ineffective assistance of counsel bears the burden of establishing two elements: (1) that his trial counsel's performance fell below objective standards for reasonably effective representation, and (2) that counsel's deficiency prejudiced the defense." *Blake v. United States*, 723 F.3d 870, 879 (7th Cir. 2013) (citing *Strickland*, 466 U.S. at 687–88; *United States v. Jones*, 635 F.3d 909, 915 (7th Cir. 2011); and *Wyatt v. United States*, 574 F.3d 455, 457 (7th Cir. 2009)). "[A] court does not need to address the *Strickland* prongs in any particular order. If one prong is found to be insufficient, the court need not address the other prong." *Ruhl v. Hardy*, 743 F.3d 1083, 1092 (7th Cir. 2014) (citing *Strickland*, 466 U.S. at 697).

"First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Strickland,* 466 U.S. at 687. With respect to this deficiency prong, the Court must bear in mind that "[c]ounsel's work must be assessed as a whole; it is the overall deficient performance, rather than a specific failing, that constitutes the ground of relief." *People v. United States*, 403 F.3d 844, 848 (7th Cir. 2005) (citing *Bell v. Cone*, 535 U.S. 685, 697 (2002); *Strickland*, 466 U.S. at 690; and *Holman v. Gilmore*, 126 F.3d 876, 881–84 (7th Cir. 1997)).

"To satisfy the second *Strickland* element, [the petitioner] must show that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different, such that the proceedings were fundamentally unfair or unreliable." *Blake*, 723 F.3d at 879 (citing *Jones*, 635 F.3d at 915 and *Adams v. Bertrand*, 453 F.3d 428, 435 (7th Cir. 2006)). In analyzing the prejudice prong, "the issue is not . . . whether [the petitioner] is actually innocent, but instead whether he would have had a 'reasonable chance' of acquittal absent counsel's [alleged] errors." *Blackmon v. Williams*, 823 F.3d 1088, 1105 (7th Cir. 2016) (quoting *Stanley v. Bartley*, 465 F.3d 810, 814 (7th Cir. 2006)). A "reasonable likelihood" is one that is "substantial, not just conceivable." *Id.* at 1107 (quoting *Richter*, 562 U.S. at 112)).

"Federal habeas review of a claim for ineffective assistance of counsel is 'doubly deferential.'" *Karr v. Sevier*, 29 F.4th 873, 880 (7th Cir. 2022) (quoting *Minnick v. Winkleski*, 15 F.4th 460, 468 (7th Cir. 2021), *cert denied*, 142 S. Ct. 1367 (2022)). Courts "must give 'both the state court and the defense attorney the benefit of the doubt.'" *Id.* (quoting *Burt*, 571 U.S. at 15). "Accordingly, for ineffective assistance claims there is a steep hill to climb, and under § 2254(d), '[t]hat hill is even steeper.'" *Rogers v. Wells*, 96

F.4th 1006, 1011 (7th Cir. 2024) (quoting *Myers v. Neal*, 975 F.3d 611, 620 (7th Cir. 2020) and citing *Strickland*, 466 U.S. at 689–90).

While counsel's performance should be evaluated holistically, *see United States v. Hamm,* 786 F.2d 804, 806 (7th Cir. 1986) ("We measure counsel's performance by the totality of the circumstances . . . ." (citing *United States v. Flick*, 719 F.2d 246, 248 (7th Cir. 1983), *cert. denied*, 466 U.S. 962 (1984))), the Court nevertheless delineates each of Petitioner's specific complaints separately for organizational purposes.

### 4.2.1 Mid-Trial Security Changes—Right to Counsel

Petitioner's first complaint about trial counsel's performance is that counsel's failure to object to mid-trial security changes—specifically, the facts that Tuinstra was moved away from his lawyer's table and "had an extra deputy stationed directly behind him"—violated his right to counsel, ostensibly because the security changes affected his ability to consult with counsel. ECF No. 1 at 8–9; ECF No. 15 at 13–14. This contention fails.

The Wisconsin Court of Appeals agreed with the trial court that "Tuinstra ha[d] not shown that trial counsel performed deficiently with respect to the security changes." 959 N.W.2d, ¶ 28. The court noted that the security measures were reached after collaboration between the State, the sheriff's department, and Petitioner's own counsel; that defense counsel deemed the situation to be "the best possible result" out of all options discussed; and that defense counsel did not think the changes made "much difference" to the trial or were "anything that was noticeable to the jury." *Id.* ¶ 26.

That decision did not run afoul of clearly established Supreme Court precedent. Counsel was not deficient for failing to object to the mid-trial security changes because all parties agreed at that time that the changes did

not genuinely impede Tuinstra's ability to consult with his counsel. Trial counsel opined that the changes represented a fair and appropriate arrangement, and Tuinstra himself told the court that he believed he could still appropriately consult with his attorneys notwithstanding the security changes. ECF No. 7-6 at 20; ECF No. 7-16 at 106 (defense counsel testifying at postconviction hearing) ("[T]hey just angled his desk a little. . . . [I]t was just shifted a little bit. I could still talk to him, he could still easily pass notes.").

Tuinstra later testified at a postconviction hearing that the changes interfered with his ability to talk to defense counsel, ECF No. 7-16 at 191, but it was not unreasonable for the court to reject his testimony on that point in favor of defense counsel's testimony that they were still easily able to communicate, particularly since Tuinstra waffled on the point. *Id.* at 199 (Q: "And so when the tables were shifted here, you said you were still able to communicate with Attorney Private; is that correct?" A: Um, at first. Cuz [sic] I didn't want it [to] cause any more trouble."). There is nothing in the record to suggest that the court's credibility determination in that respect should be questioned. *Gambaiani v. Greene,* No. 23-2690, 2025 U.S. App. LEXIS 11479, at *27 (7th Cir. May 13, 2025) ("We give great deference to credibility determinations in particular [on habeas review]. . . . And although a petitioner 'may disagree with the state court's weighing of certain facts, the highly deferential habeas review does not permit a federal court to conduct its own independent inquiry and reweigh factors as a de novo matter.'" (quoting *Sanders v. Radtke,* 48 F.4th 502, 510–11 (7th Cir. 2022))). Tuinstra is accordingly not entitled to relief on this basis.

### 4.2.2 Remaining Ineffective Assistance of Counsel Allegations

The Wisconsin Court of Appeals declined to analyze whether Petitioner's remaining allegations of ineffective assistance of counsel in fact demonstrated deficient performance because it concluded that that he had in any event failed to demonstrate prejudice. 959 N.W.2d, ¶¶ 30, 36.

> The trial court's written decision analyzes key trial evidence that supported the State's theory that Tuinstra stalked Melissa and shot both Melissa and Daniels. For instance, Tuinstra's neighbor testified that he overheard a phone conversation between Tuinstra and Daniels where Tuinstra said, "[I]f I find you, I am going to kill you." In addition, Tuinstra "had access to guns, and he practiced shooting them regularly." The trial court noted: "The autopsies confirmed that 13 or 14 shots hit the bodies of Melissa and [Daniels], and nine of the shots were fatal wounds." Further, the Beretta 9 mm handgun that Tuinstra purchased two and one-half months before the homicides was never found; a search of Tuinstra's home uncovered only the empty box for the gun.

> The trial court's decision also discussed the night Melissa and Daniels were shot. Tuinstra admitted that he spoke with Melissa by phone and text, although a forensic analysis of Tuinstra's phone revealed that "he had deleted certain content," including his contacts with Melissa on the night of her death. The police were able to pinpoint the time of the homicides by listening to a voice mail message Daniels left for a friend at 10:14 p.m. That recording contained only the sounds of gunshots, "a door slamming," and then silence, indicating that Daniels and Melissa were shot "only minutes after [Tuinstra] would have arrived after walking to Melissa's apartment from his house."

> The trial court discussed Tuinstra's statements to the police. In the first interview, Tuinstra "did not reveal that he owned a 9 mm handgun," even though he was asked—twice—to list all of his guns. Further, Tuinstra claimed in his first interview that he had never been to Melissa's apartment, but in his

second interview, he admitted that he went to the apartment the night of the homicides.

Ultimately, the trial court concluded that the numerous alleged deficiencies of trial counsel did not "undermine confidence in the reliability of the result of the trial" and that there was not "a reasonable probability that a jury viewing the evidence untainted by counsel's errors would have had a reasonable doubt respecting guilt."

On appeal, Tuinstra alleges that he was prejudiced by trial counsel's alleged deficiencies, both individually and cumulatively, but he does not directly address the trial court's prejudice analysis. For instance, he argues that trial counsel's failure to challenge the State's domestic violence expert allowed the State to "paint[] a frightening picture of domestic violence as an out of control epidemic using statistics of dubious validity." Similarly, when Tuinstra argues that trial counsel should have objected to the introduction of Melissa's hearsay statements to a friend about her fear of Tuinstra, he asserts: "It was unfairly prejudicial and would have negatively affected the jurors' view of Tuinstra." However, Tuinstra does not adequately explain how a more robust examination of the State's domestic violence expert or the exclusion of numerous hearsay statements would have affected the remaining evidence that the trial court discussed in its prejudice analysis. Tuinstra's arguments are insufficient to demonstrate prejudice as defined by *Strickland* and its progeny.

We have reviewed the entire record . . . including the trial court's detailed summary of the evidence against Tuinstra. Having "examine[d] the totality of the circumstances to determine whether counsel's errors, in the context of the entire case, deprived the defendant of a fair trial," we conclude that Tuinstra has not shown that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." See [*State v.*] *Domke*[, 805 N.W.2d 364, ¶ 54 (Wis. 2011)] . . . . Whether we consider the alleged errors individually or cumulatively, Tuinstra has not established prejudice.

*Id.*, ¶¶ 31–36.

Petitioner characterizes this analysis as "flawed and unreasonable." ECF No. 15 at 28. The Court does not agree. The Wisconsin Court of Appeals correctly recited and applied the prejudice standard, considering the trial record as a whole. Although the court did not explicitly discuss "any of the weaknesses" of the State's case, *id.*, it noted that it had reached its determination upon a "review[] of the *entire* record" and "in the context of the *entire* case." 959 N.W.2d, ¶ 36 (emphases added).

Petitioner disputes the Wisconsin Court of Appeals' assessment of the strength of the State's case against him, but the Court cannot conclude that the Wisconsin Court of Appeals' assessment on that point was "so erroneous" that it constituted an "extreme malfunction in the state criminal justice system." *Nevada*, 569 U.S. at 508; *Harrington*, 562 U.S. at 102 (citing *Jackson*, 443 U.S. at 332, n.5).

Petitioner's characterizations of the case against him are simply inaccurate. For example, he asserts that "no physical or forensic evidence linked [Petitioner] to the crime," ECF No. 15 at 28, and that is simply not true. While there may not have been blood or DNA evidence connecting him to the homicides, there was nevertheless physical and forensic evidence in other forms that was indicative of his guilt: for example, the text message in which he threatened to "visit" Justin, ECF No. 7-6 at 154; the blue 9mm firearm box found in the gun safe, ECF Nos. 7-5 at 160 and 7-7 at 198; and the handwritten will dated just weeks before the homicides in which Petitioner omitted acknowledgment of Melissa, ECF No. 7-7 at 95–99.

This is not a case in which only "relatively thin evidence [was] presented at [Petitioner's] trial." *Adams*, 453 F.3d at 438; *Blackmon*, 823 F.3d

at 1105 ("A verdict . . . that is overwhelming supported by the record is less likely to have been affected by errors than one that is only weakly supported by the record." (quoting *Hough v. Anderson*, 272 F.3d 878, 891 (7th Cir. 2001) and citing *Thomas v. Clements*, 789 F.3d 760, 771–72 (7th Cir. 2015))). In addition to the physical evidence just recounted, the jury heard that Melissa and Petitioner had signed their divorce paper just three days before the homicides, ECF No. 7-5 at 231–32, and that the divorce was initiated by Melissa and opposed by Petitioner, ECF No. 7-8 at 87–87; that Tuinstra had demonstrated angry and violent behavior towards Melissa, *id.* at 180, 207–08, 214–16; that Tuinstra had purchased a gun of the type used in the homicides just a few months before, *id.* at 127–128, 146–248; that he lied to police about having that gun, ECF No. 7-8 at 84; that a witness described Petitioner as "upset" about the divorce on the night of the homicides, ECF No. 7-5 at 235–38; that Tuinstra lied to police about when he arrived at his parents' house that night, ECF No. 7-8 at 90–92; that Tuinstra's true arrival time at his parents' house afforded him sufficient time to commit the homicides and drive to his parents', ECF No. 7-7 at 208–10, 213–15; that Petitioner visited Melissa's apartment and the scene of the homicides just minutes before gunshots were there heard, ECF No. 7-11 at 66 and ECF No. 7-5 at 244 (testimony regarding timing of gunshots); that he later lied to police about ever having been there, ECF No. 7-8 at 85; that his reaction upon being told by police that his wife had been killed was "very minimal," ECF No. 7-8 at 84, 86; and that he later told a social worker that the "dream" he had the night of the homicides in which "something bad" happened to Melissa might not have been a dream and that he might have "been involved," ECF No. 7-11 at 28–29. In contrast, in *Blackmon*, the court concluded that the prejudice prong was met where the State presented no

evidence of "motive or connection between [Petitioner] and the victim" *and* there was a "dearth of physical evidence." 823 F.3d at 1106–07. Meanwhile, this case presented an abundance of circumstantial evidence which, commonsensically viewed, amply supported the guilty verdicts. *See United States v. Balzano*, 916 F.2d 1273, 1284 (7th Cir. 1990) ("Circumstantial evidence is not less probative than direct evidence and, in some cases[,] is even more reliable." (quoting *United States v. Grier*, 866 F.2d 908, 923 (7th Cir. 1989))). For these reasons, Petitioner is not entitled to relief on this ground.

**5.    CONCLUSION**

"[F]ederal habeas relief from state convictions is rare." *Dassey v. Dittmann*, 877 F.3d 297, 302 (7th Cir. 2017). "It is reserved for those relatively uncommon cases in which state courts veer well outside the channels of reasonable decision-making . . . ." *Id.* This is not such a case. Accordingly, the Court will deny the petition and dismiss this action with prejudice.

Under Rule 11(a) of the Rules Governing Section 2254 Cases, "the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." To obtain a certificate of appealability under 28 U.S.C. § 2253(c)(2), a petitioner must make a "substantial showing of the denial of a constitutional right" by establishing that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). No reasonable jurists could debate whether the petition has merit. The Court must, therefore, deny Petitioner a certificate of appealability.

Accordingly,

**IT IS ORDERED** that the Clerk of Court shall replace Gary Boughton with Michael Meisner as Respondent in this matter;

**IT IS FURTHER ORDERED** that Petitioner Nicholas Tuinstra's petition for a writ of habeas corpus, ECF No. 1, be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that a certificate of appealability be and the same is hereby **DENIED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 24th day of July, 2025.

BY THE COURT:

J. P. Stadtmueller
U.S. District Judge